**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **DEVON FRANCIS,** | : | **CIVIL ACTION** |
| **Plaintiff,** | : | |
| | : | |
| **v.** | : | **NO. 11-6487** |
| | : | |
| **ATLAS MACHINING** | : | |
| **& WELDING, INC., et al.,** | : | |
| **Defendants.** | : | |

**M E M O R A N D U M**

**STENGEL, J.** **February 14, 2013**

Plaintiff Devon Francis brings this action against his former employer, Atlas Machining and Welding, Inc. (Atlas), as well as Harold Keeney, Thomas Regec, Michael Kresge, and Michael Lansenderfer (collectively, Defendants). Francis alleges violations of 42 U.S.C. § 1981 and Title VII of the Civil Rights Act of 1964 (Title VII), 42 U.S.C. § 2000e *et seq*. The parties filed cross motions for summary judgment.[1] For the following reasons, I will deny both motions.

[1] I note that Francis' filings do not conform to my rules of procedure. With regard to motions for summary judgment, my rules indicate:

> With any motion for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure, there shall be filed a separate, short, and concise statement of the material facts, *in numbered paragraphs*, as to which the moving party contends there is no genuine issue to be tried. The papers opposing a motion for summary judgment shall include a separate, short, and concise statement of the material facts, *responding to the numbered paragraphs set forth in the statement required in the foregoing paragraph*, as to which it is contended there exists a genuine issue to be tried.

Section II.C.4. (emphases added). Here, the parties both filed motions for summary judgment. Defendants' motion properly includes a separate, numbered statement of material facts. Francis did not respond in kind; instead, his response includes a narrative introduction in which he expressly disputes some of Defendants' facts but otherwise "refers the Court to his Motion for Summary Judgment." Doc. No. 18 at 1-2. Francis' motion, however, is equally noncompliant, given that he provides only a narrative statement of material facts. Doc. No. 10 at 3-17. Francis' failure to comply with my rules of procedure has placed a considerable unnecessary burden on the court. While I have culled from Francis' filings all the facts he appears to dispute, Francis' counsel is cautioned that any future submissions must conform to my rules of procedure.

## I. BACKGROUND[2]

Defendant Atlas hired Francis, who is African American, on January 17, 2005, as a welder. At all times relevant to this lawsuit, Defendant Kenney was Atlas' president and chief executive officer; Defendant Regec was Atlas' weld shop supervisor; Defendant Lansenderfer was a welder; and Defendant Kresge was a welder until his promotion to welding foreman in August 2007.

### A. Racial Comments by Kresge and Lansenderfer

Francis claims that "within the first starting weeks" and throughout his employment at Atlas, Kresge and Lansenderfer directed racial slurs toward him. Francis Dep. at 33. Specifically, Francis alleges that Kresge and Lansenderfer would yell "get out[] nigger [and] here comes the boy," that Lansenderfer "said that he wished all niggers would go back to Africa," that Kresge "specifically looked [Francis] in the eye and said [he] was only the second nigger he enjoyed speaking to," and that Kresge stated to Francis that "niggers were lazy." Id. at 33-34, 36, 40. Francis claims these comments were made "whenever [he] entered into the weld shop area." Id. at 33.

Francis claims he reported the slurs to Regec in the first month of his employment and "every five to six months" thereafter. Id. at 41. Regec purportedly responded that Francis shouldn't "worry about [Kresge and Lansenderfer]. They're from the mountains. They're not used to being around black people." Francis Dep. at 36, 38. Despite these reports, Francis claims Kresge and Lansenderfer's harassing behavior continued unabated

[2] The facts in this section are undisputed unless otherwise noted.

until Kresge's promotion to welding foreman in August 2007, after which Francis was harassed "every now and then." Id. at 42, 52-54.

Kresge and Lansenderfer both flatly deny they ever directed racial slurs toward Francis. Kresge Dep. at 13-14; Lansenderfer Dep. at 19-21. Regec denies that Francis ever personally complained to him about Kresge and Lansenderfer. Regec Dep. at 21.

**B. The First Noose**

In July 2007, Francis first noticed a hangman's noose hanging from a welding boom near Kresge's workstation.[3] Francis Dep. at 42. Defendants contend the noose long pre-dated Francis' employment with Atlas. Regec Dep. at 23; Kresge Dep. at 15. In any event, Keeney was called to investigate. Although the parties appear to dispute Keeney's initial reaction to the noose,[4] they agree that Keeney ordered it taken down immediately and retied to Francis' satisfaction. Francis Dep. at 45-47; H. Keeney Dep. at 28.

**C. The Second "Noose"**

On July 24, 2008, Francis again observed what he perceived to be a hangman's noose near the same workstation, which Lansenderfer occupied following Kresge's

---

[3] Many, if not all, of the welding booms at Atlas had a rope hanging from them, which enabled the welder to move the boom. Francis Dep. at 48-49; H. Keeney Dep. at 30. The parties agree that this particular rope was tied into a noose; that is, a loop tied with a slipknot. Francis Dep. at 47; H. Keeney Dep. at 29. They dispute, however, the manner in which the other boom ropes were tied. Francis claims that the other boom ropes were simply ropes with a solid knot at the end and that this is how the first offending rope was retied. Francis Dep. at 48-49. Keeney claims the other boom ropes were loops tied with non-slipping knots and that this is how the first offending rope was retied. H. Keeney Dep. at 29.

[4] Francis contends that Keeney, upon seeing the noose, stated that Francis was being "oversensitive" and that the noose reminded Keeney of "medieval times because more white people were hung with nooses back [then]." Francis Dep. at 45. Keeney recalls simply ordering that the noose be taken down and promising Francis that he will "never see it again." H. Keeney Dep. at 30-31.

promotion to welding foreman.[5] Francis Dep. at 58. Francis alerted Keeney. H. Keeney Dep. at 41. Francis and Keeney proceeded to have a "back and forth," during which Francis complained about Kresge and Lansenderfer's verbal harassment.[6] Francis Dep. at 60-61. Following this exchange, another Atlas employee, Todd Ervin, offered to assist Francis in taking down the noose after work. Francis Dep. at 63-64. Francis declined, and the purported noose hung for the remainder of July 24.

Francis returned to work the following day, July 25, to find the noose still hanging; it remained hanging when he left that evening.[7] Id. at 64-65; H. Keeney Dep. at 47. The noose was taken down at some point before Francis returned to work the following week. Francis Dep. at 69-70. Keeney claims he didn't take the noose down immediately so he could "investigate the situation and find out what's going on." H. Keeney Dep. at 48.

**D. Francis' Resignation from Atlas**

Francis claims he felt "extremely depressed" and suffered panic attacks following his shift on July 25. Francis Dep. at 66-67. He visited his doctor, who prescribed him an antidepressant and a sleep aid, and referred him to a psychologist. Id. Francis returned to

[5] The parties dispute whether this second "noose" was in fact a noose. Keeney claims the rope was tied in the same manner Francis had previously found to be acceptable; that is, a loop tied with a non-slipping knot. H. Keeney Dep. at 41. Francis claims that the rope was in fact tied into a noose and that he noticed it because it had previously been tied with a solid knot at the end. Francis Dep. at 58-59. Francis snapped two blurry pictures with his cell phone, which I have examined. Although the rope is clearly tied into a loop, whether it is tied with a slipknot is not readily apparent.

[6] The outcome and specifics of this conversation—which apparently involved a discussion of Reverend Jeremiah Wright and a suggestion by Keeney that Francis "should take it as a compliment that [Kresge and Lansenderfer] don't like [Francis'] kind but [do] like [him]"—are not clear from the record. Francis Dep. at 60-61; H. Keeney Dep. at 45-46, 48-49. Francis claims Keeney again accused him of being "oversensitive." Francis Dep. at 60. Importantly, Francis contends this was the *second* time he informed Keeney about Kresge and Lansenderfer's behavior, having first done so following the July 2007 noose incident. Francis Dep. at 61.

[7] Francis claims Keeney stated it was "good thing" Francis didn't take the noose down because "it might [have] cause[d] problems with other guys and then things could escalate . . . and somebody would have to get fired." Francis Dep. at 64.

work on July 30 but only sporadically thereafter. At some point prior to Francis' resignation, Keeney phoned Francis to apologize for any offense he may have caused. Francis Dep. at 80-81; H. Keeney Dep. at 53-54. On August 18, 2008, Francis resigned.

### E. Subsequent Unemployment Compensation Proceedings

Following his resignation, Francis applied for and was granted state unemployment benefits. Atlas appealed the decision, which resulted in two hearings before an unemployment referee. The referee found in Francis' favor and determined that there were "necessitous and compelling reasons" for him to resign. Atlas appealed the referee's decision to the Unemployment Compensation Board of Review (UCBR), which affirmed. Finally, Atlas appealed the UCBR's decision to the Commonwealth Court, which also affirmed.

## II. STANDARD OF REVIEW

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A factual dispute is "material" only if it might affect the outcome of the case. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). For an issue to be "genuine," a reasonable fact-finder must be able to return a verdict in favor of the non-moving party. Id.

A party moving for summary judgment always bears the initial burden of informing the Court of the basis for its motion and identifying those portions of the record that it believes demonstrate the absence of a genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). A party asserting that a fact cannot

be or is genuinely disputed must support the assertion by citing relevant portions of the record, including depositions, documents, affidavits, or declarations, or showing that the materials cited do not establish the absence or presence of a genuine dispute, or showing that an adverse party cannot produce admissible evidence to support the fact. Fed. R. Civ. P. 56(c). Summary judgment is therefore appropriate when the non-moving party fails to rebut the moving party's argument that there is no genuine issue of fact by pointing to evidence that is "sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex Corp., 477 U.S. at 322; Harter v. GAF Corp., 967 F.2d 846, 852 (3d Cir. 1992).

Under Rule 56, the Court must draw "all justifiable inferences" in favor of the non-moving party. Anderson, 477 U.S. at 255. The Court must decide "not whether . . . the evidence unmistakably favors one side or the other but whether a fair-minded jury could return a verdict for the plaintiff on the evidence presented." Id. at 252. The nonmoving party cannot avert summary judgment with speculation or conclusory allegations, such as those found in the pleadings, but rather, must present clear evidence from which a jury can reasonably find in its favor. Ridgewood Bd. of Educ. v. N.E. for M.E., 172 F.3d 238, 252 (3d Cir. 1999).

## III. DISCUSSION

### A. Preliminary Matters

#### 1. Harassment Occurring Prior to the Limitations Period

Defendants contend that much of the offensive conduct Francis complains of cannot serve as a basis for Title VII liability because it occurred more than 300 days prior

to the filing of his EEOC charge. Specifically, Defendants argue that the first noose and all but eight and a half months of verbal harassment may not be considered.[8] Doc. No. 12-4 at 16-17. I disagree.

Generally, in a Title VII claim, "all discriminatory acts that are alleged to have occurred more than 300 days prior to the EEOC filing are time-barred." Verdin v. Weeks Marine Inc., 124 F. App'x 92, 95 (3d Cir. 2005). Hostile work environment claims are different, however. "A hostile work environment claim is composed of a series of separate acts that collectively constitute one 'unlawful employment practice.'" Nat'l R.R. Passenger Corp. v. Morgan, 536 U.S. 101, 117 (2002) (quoting 42 U.S.C. § 2000e–5(e)(1)). Accordingly, "[i]t does not matter, for purposes of the statute, that some of the component acts of the hostile work environment fall outside the statutory time period. Provided that an act contributing to the claim occurs within the filing period, the entire time period of the hostile environment may be considered by a court for the purposes of determining liability." Morgan, 536 U.S. at 117.

The question then is whether discovery of the first noose and verbal harassment from January 17, 2005, to November 7, 2007,[9] constitute "component acts of the hostile work environment," id., where discovery of the second noose and verbal harassment from November 8, 2007, to August 18, 2008, occurred within the filing period. I find they do.

---

[8] Defendants do not dispute that all of the allegedly harassing conduct falls within § 1981's four-year statute of limitations. Verdin v. Weeks Marine Inc., 124 F. App'x 92, 96 n.2 (3d Cir. 2005).

[9] November 7, 2007, marks 300 days prior to the filing of Francis' initial charge on September 2, 2008. Francis filed an amended charge on May 14, 2009, in which he added the allegations of verbal harassment. EEOC regulations provide that "[a] charge may be amended . . . to clarify and amplify allegations made therein. Such amendments and amendments alleging additional acts which constitute unlawful employment practices related to or growing out of the subject matter of the original charge will relate back to the date the charge was first received." 29 C.F.R. § 1601.12(b). Francis' allegations of verbal harassment, which concern the same race-based hostile work environment claim set forth in his initial charge, fall squarely within § 1601.12(b).

Indeed, Francis' claims mirror in large part those of the plaintiff in Morgan. There, the plaintiff complained that "managers made racial jokes, performed racially derogatory acts, . . . and used various racial epithets." Id. at 120. "Although many of the acts . . . occurred outside the 300 day filing period," the Court concluded they were "part of the same actionable hostile environment claim." Id. at 120-21. As in Morgan, the pre- and post-limitations conduct Francis complains of involved the same actions and the same individuals. Id. All of it may therefore be considered for the purposes of determining Title VII liability.

**2. Individual Liability Under § 1981**

Defendants contend that Kresge, Lansenderfer, Keeney, and Regec cannot as a matter of law be held individually liable under § 1981. Doc. No. 12-4 at 17-19. I disagree.

Defendants argue that Kresge and Lansenderfer cannot be held individually liable because "they were not supervisory employees with the power to affect [Francis'] employment" and because they were not "directly responsible" for the alleged discrimination. Id. at 17-18. Notwithstanding that Kresge is alleged to have harassed Francis even after his promotion to foreman, there is no requirement in this Circuit that a defendant be a "supervisory employee" for individual liability under § 1981 to attach. Indeed, Defendants cite no binding case law in support of this proposition. Rather, the Third Circuit has held that "[i]f *individuals* are personally involved in the discrimination against the [plaintiff], and if they intentionally caused [an infringement of rights protected by Section 1981], or if they authorized, directed, *or participated* in the alleged

discriminatory conduct, they may be held liable." Al-Khazraji v. Saint Francis Coll., 784 F.2d 505, 518 (3d Cir. 1986) (emphases added); see also Johnson v. Res. for Human Dev., Inc., 843 F. Supp. 974, 978 (E.D. Pa. 1994); Santiago v. City of Vineland, 107 F. Supp. 2d 512, 541 (D.N.J. 2000). Kresge and Lansenderfer may be held individually liable despite their status as Francis' co-workers and despite their collective responsibility for the alleged discrimination.

Defendants also argue that Keeney and Regec were not personally involved in the discriminatory conduct and thus cannot be held individually liable. Again, I disagree. Francis testified that he reported instances of verbal harassment to both Keeney and Regec, and that neither did anything in response. Keeney also permitted the July 2008 noose to hang for at least two days following its discovery. This conduct is sufficient to demonstrate personal involvement. E.g., Brown v. New York State Dept. of Corr. Services, 583 F. Supp. 2d 404, 411 (W.D.N.Y. 2008) (plaintiff satisfied § 1981 personal involvement requirement by alleging that individual defendant had witnessed the harassment or had received direct complaints from plaintiff about that harassment and did nothing in response).

Francis has produced enough evidence to sustain his § 1981 claims against Kresge, Lansenderfer, Keeney, and Regec.

### B. Summary Judgment

#### 1. Preclusive Effect of Unemployment Compensation Proceedings

Francis' motion for summary judgment is premised entirely on the preclusive effect of the parties' unemployment compensation proceedings. He contends that the

"factual findings of [his] resignation by the [UCBR], as affirmed by the Commonwealth Court of Pennsylvania, must be given collateral estoppel effect so as to preclude litigation of his Section 1981 and Title VII claims in federal court." Doc. No. 10 at 17. I disagree.

Federal courts must give preclusive effect to state court judgments, including state agency decisions, "whenever the courts of the State from which the judgments emerged would do so." Allen v. McCurry, 449 U.S. 90, 96 (1980) (citing 28 U.S.C. § 1738); see also University of Tenn. v. Elliott, 478 U.S. 788, 796-97 (1986). Thus, I must look to Pennsylvania law to determine whether Pennsylvania courts would give preclusive effect to the parties' unemployment compensation proceedings in the present action. Kelley v. TYK Refractories Co., 860 F.2d 1188, 1193-94 (3d Cir. 1988).

Under Pennsylvania law, collateral estoppel precludes relitigation of an issue determined in a previous action where:

> (1) the issue decided in the prior case is identical to the one presented in the later action; (2) there was a final adjudication on the merits; (3) the party against whom the plea is asserted was a party or in privity with a party in the prior case; (4) the party or person privy to the party against whom the doctrine is asserted had a full and fair opportunity to litigate the issue in the prior proceeding; and (5) the determination in the prior proceeding was essential to the judgment.

Office of Disciplinary Counsel v. Kiesewetter, 585 Pa. 477, 484 (2005). Because I find that Defendants did not have a full and fair opportunity to litigate the circumstances of Francis' resignation in the parties' unemployment compensation proceedings, I do not address the remaining elements. The Pennsylvania Supreme Court's decision in Rue v. K-Mart Corp., 552 Pa. 13 (1998), which Francis does not even cite, settled the issue. There, the court found that "[t]he substantial procedural and economic disparities

between unemployment compensation proceedings and later civil proceedings negate the preclusive effect of a Referee's factual findings." Id. at 20-21. Interpreting Rue, courts in this district have declined to give preclusive effect to unemployment compensation proceedings, whether reviewed or unreviewed, in later employment discrimination suits. See Torres v. EAFCO, Inc., CIV. A. 00-2846, 2001 WL 41135, at *3 (E.D. Pa. Jan. 17, 2001) ("[T]he courts of Pennsylvania no longer apply the doctrines of preclusion in the unemployment compensation context."); see also Helfrich v. Lehigh Valley Hosp., CIV.A. 03-CV-05793, 2005 WL 1715689, at *18-20 (E.D. Pa. July 21, 2005); Long v. Valley Forge Military Acad. Found., CIV.A2. 05-4454, 2008 WL 5157508, at *14 (E.D. Pa. Dec. 8, 2008). Francis' argument to the contrary is therefore without merit, and his motion for summary judgment is denied.

### 2. Hostile Work Environment

Title VII and § 1981[10] prohibit harassment "sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." Meritor Sav. Bank, FSB v. Vinson, 477 U.S. 57, 67 (1986) (internal quotation marks and brackets omitted). To prevail on a race-based hostile work environment claim, a plaintiff must prove that (1) he suffered intentional discrimination because of his race; (2) the discrimination was severe or pervasive; (3) the discrimination detrimentally affected him; (4) it would have detrimentally affected a reasonable person in like circumstances; and (5) a basis for employer liability is present. Jensen v. Potter,

[10] The standard for a hostile work environment claim under § 1981 is the same as under Title VII. Williams v. Mercy Health Sys., 866 F. Supp. 2d 490, 501 (E.D. Pa. 2012).

435 F.3d 444, 449 (3d Cir. 2006). Defendants contest the second and fifth prongs in their motion.

Courts look to the "totality of the circumstances" in assessing whether harassment was severe or pervasive. Andrews v. City of Philadelphia, 895 F.2d 1469, 1482 (3d Cir. 1990). Factors to consider "include the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." Harris v. Forklift Sys., Inc., 510 U.S. 17, 23 (1993). "No one factor is dispositive"; however, "[o]ccasional insults, teasing, or episodic instances of ridicule are not enough." Jensen, 435 F.3d at 451.

Francis has proffered evidence sufficient to survive Defendants' motion. Viewed in Francis' favor, the record evidence indicates that "within the first starting weeks" Kresge and Lansenderfer would yell "get out[] nigger [and] here comes the boy . . . as soon as [Francis] crossed through the [weld shop] doorway," that Lansenderfer "said that he wished all niggers would go back to Africa," that Kresge "specifically looked [Francis] in the eye and said [he] was only the second nigger he enjoyed speaking to," and that Kresge stated to Francis that "niggers were lazy." Francis Dep. at 33-34, 36, 40. Although the harassment became less frequent following Kresge's promotion to foreman in August 2007, Francis was still harassed "every now and then," including through continued use of the word "nigger." Id. at 52-54. Repeated use of the racial epithet "nigger" may support a finding of severe or pervasive harassment. See, e.g., Williams v. Mercy Health Sys., 866 F. Supp. 2d 490, 501-02 (E.D. Pa. 2012) ("'Nigger' is a word

steeped in racial animus and instantly separates an African–American from everyone else. . . . Indeed, it is difficult for the Court to understand how the use of the word 'nigger,' with its history of animus, would do anything but change Plaintiff's terms of employment."). That two nooses were allegedly hung from Kresge and Lansenderfer's workstation only strengthens Francis' claim. Tademy v. Union Pac. Corp., 614 F.3d 1132, 1141 (10th Cir. 2008) ("[C]ourts have recognized that a noose may constitute part of a hostile environment claim.") (collecting cases).

As for Atlas' liability, that depends initially on whether Kresge and Lansenderfer were Francis' supervisors or merely his co-workers. Huston v. Procter & Gamble Paper Products Corp., 568 F.3d 100, 104 (3d Cir. 2009). There is no dispute that Lansenderfer, a welder, was Francis' co-worker. Kresge's status is less clear, given that he is alleged to have harassed Francis as both a welder and welding foreman. Even as welding foreman, however, Kresge was not a supervisor for purposes of Title VII. Although the record is thinly developed in this regard, Lansenderfer testified that the job of welding foreman was to "get the work out the door [and] basically help [the welders]." Lansenderfer Dep. at 17; see also Francis Dep. at 29-30. Although there is some testimony that Kresge occasionally allocated overtime, L. Keeney Dep. at 53, the parties have not pointed to any evidence that he possessed "the authority to hire, fire, and discipline the staff he worked with," Neely v. McDonald's Corp., 340 F. App'x 83, 85 (3d Cir. 2009), or otherwise "affect the employment status" of Atlas' welders, Huston, 568 F.3d at 108. Given that his primary responsibility appears to have been simply "overseeing the performance of others in completing the work at hand," I find that even as welding foreman Kresge was

not a supervisor under Title VII. Neely, 340 F. App'x at 85 (citing Huston, 568 F.3d at 107-08).

Having concluded that Kresge and Lansenderfer were at all relevant times Francis' co-workers, the burden is on Francis to prove that Atlas "is liable for [his] coworker's conduct by showing that 'management knew or should have known about the harassment, but failed to take prompt and adequate remedial action.'" Andreoli v. Gates, 482 F.3d 641, 648 (3d Cir. 2007) (quoting Jensen v. Potter, 435 F.3d 444, 452-53 (3d Cir. 2006); see also Huston, 568 F.3d at 104-05. Francis has produced evidence to easily meet his burden on summary judgment. He alleges he complained directly to Keeney about Kresge and Lansenderfer's verbal harassment as early as the July 2007 noose incident and that Keeney did nothing in response. Furthermore, although Keeney did immediately remove the July 2007 noose, he left the July 2008 noose hanging for at least two days. Under the circumstances, a jury could reasonably conclude that Keeney's response to the July 2008 noose was inadequate given that it permitted obviously offensive conduct to continue, even for a short period of time. This alone is sufficient to survive summary judgment. I note, however, Francis also testified that he repeatedly complained to Regec about Kresge and Lansenderfer's verbal harassment and that Regec neither took corrective action nor reported the conduct to management personnel. Although Regec's ability to hire, fire, and discipline is not apparent from the record, there is evidence indicating that he was "sufficiently senior in the employer's governing hierarchy" to justify imputing his knowledge to Atlas or at least that Francis perceived him to be. Huston, 568 F.3d at 107; see also Rorrer v. Cleveland Steel Container, 712 F. Supp. 2d

422, 434 (E.D. Pa. 2010) ("Apparent authority may bind a company for the purposes of Title VII, if a harassment victim reasonably believes that an official has a duty to stop or report the harassment.") (citations, brackets, and quotation marks omitted). Regec alone oversaw the weld shop, reporting only to the plant manager and Keeney. H. Keeney Dep. at 23; L. Keeney Dep. at 16. In that capacity, Atlas expected him to report instances of harassment. L. Keeney Dep. at 42. Moreover, Francis understood that "the procedure [for reporting workplace problems] was to go to [his] manager, [who] would bring it to Harold Keeney." Francis Dep. at 42. Francis, of course, did so, and Regec received his complaints. There is nothing to indicate Regec ever encouraged Francis to take his complaints elsewhere. Rorrer, 712 F. Supp. 2d at 434. Thus, at a minimum, there is a factual dispute as to whether Francis reasonably believed Regec had a duty to receive, stop, or report harassment.

For these reasons, Francis hostile work environment claim survives Defendants' motion.

**3. Constructive Discharge**

Defendants contend that even if Francis has set forth a triable hostile work environment claim, his constructive discharge claim falls short. I disagree.

"A plaintiff who advances [a hostile-environment constructive discharge] claim must show working conditions so intolerable that a reasonable person would have felt compelled to resign." Pennsylvania State Police v. Suders, 542 U.S. 129, 147 (2004); see also Aman v. Cort Furniture Rental Corp., 85 F.3d 1074, 1084 (3d Cir. 1996). A hostile work environment is required to prevail; however, "[a] hostile work environment 'will

not always support a finding of constructive discharge.'" Spencer v. Wal-Mart Stores, Inc., 469 F.3d 311, 316 n.4 (3d Cir. 2006) (quoting Marrero v. Goya of P.R., Inc., 304 F.3d 7, 28 (1st Cir. 2002)). "[T]he only variation between the two claims is the severity of the hostile working conditions." Suders, 542 U.S. at 149.

Although I find Francis' constructive discharge claim to be a closer case, I conclude he has presented sufficient evidence to survive Defendants' motion. Admittedly, Francis' claim presents few of the indicators often raised by employees who assert constructive discharge claims. Francis does not allege, for instance, that he was threatened with discharge, urged to resign, or otherwise demoted, or that his pay and benefits were reduced. Clowes v. Allegheny Valley Hosp., 991 F.2d 1159, 1161 (3d Cir. 1993). In fact, the parties agree that Francis received regular pay increases and benefits, and that Keeney apologized and asked Francis to return to work following the July 2008 noose incident. Francis Dep. at 30, 73. Furthermore, it does not appear that Francis "explore[d] . . . alternative avenues thoroughly before coming to the conclusion that resignation [was] the only option." Clowes, 991 F.2d at 1161. He stopped coming to work almost immediately following his July 24 shift and resigned less than a month later. The absence of these factors is not dispositive, however. Duffy v. Paper Magic Group, Inc., 265 F.3d 163, 168 (3d Cir. 2001). Where an employer knowingly permits working conditions "so intolerable that a reasonable person subject to them would resign," a constructive discharge claim lies. Aman, 85 F.3d at 1084.

Viewing the facts in the light most favorable to Francis, a jury could very well conclude that Atlas permitted working conditions so intolerable that a reasonable

employee would have felt compelled to resign. Kresge and Lansenderfer harassed Francis from the inception of his employment. Despite numerous protests to the shop supervisor, Regec, the harassment continued. Following the July 2007 noose incident, Francis brought the harassment to Keeney's attention, yet it persisted. On July 24, 2008, a second noose appeared. Despite Keeney's previous assurances that he would not permit a noose in the workplace and Francis' renewed complaints about Kresge and Lansenderfer, the second noose hung for the remainder of Francis' shift on July 24 and the entirety of his shift on July 25. Under such circumstances, a jury may reasonably conclude that Francis "simply had had enough." Aman, 85 F.3d at 1084.

For these reasons, Francis' constructive discharge claim survives.

## IV. CONCLUSION

For the foregoing reasons, the parties' motions are denied.

An appropriate order follows.